# CITIZENS REVIEW BOARD RESEARCH BRIEF

Exhibit 4



**ADVOCATES FOR SOCIAL JUSTICE**

**JULY 2020**

# Citizens Review Board Research Brief

July 2020 draft

*Advocates for Social Justice*
Prepared by Circe Stumbo, Anne Harris Carter, Tamara Marcus, and Stacey Walker

## Acknowledgements

The brief has been a project of the Advocates for Social Justice (ASJ). ASJ is a community-based, grass-roots movement committed to creating social, political, and environmental change within the Cedar Rapids community, prioritizing the objectives of the #BLM movement.

The primary authors of this brief are Circe Stumbo, Anne Harris Carter, Tamara Marcus, and Stacey Walker.

The ASJ CRB Research Team contributed significantly to the brief, including deliberating details of the specifications and reviewing drafts of the brief. The CRB Research Team includes Anne Harris Carter, Tamara Marcus, Stacey Walker, Amara Andews, Dedric Doolin, Chuck Crawley, Nicole LeGrand. Anthony Arrington was not a formal member of the CRB Research Team, but he also made significant contributions.

ASJ thanks Nitasha Sawhney, General Counsel to the City of Oakland Police Commission, Cameron McEllhiney of the National Association for Civilian Oversight of Law Enforcement, and Hilary O. Shelton, Director of the NAACP's Washington Bureau and Senior Vice President for Advocacy and Policy for the time they lent in interviews to help us in our deliberations.

Graphic Design for this brief was provided by Capria Davis.

## Background

The Advocates for Social Justice (ASJ) presented seven demands to the City of Cedar Rapids. Weekly negotiation meetings began on June 12, 2020. At a special meeting on June 19, 2020, the City Council (The City) unanimously approved a resolution committing support for all seven demands, including that "the City of Cedar Rapids and

the Cedar Rapids Police Dept will form an independent citizens' review board" (Cedar Rapids City Council, June 19, 2020, p. 1).

While ASJ and The City agreed in concept on the establishment of a Citizens Review Board (CRB), the groups disagreed on the approach and the timeline.

ASJ has proceeded with research already underway to expedite the process with The City, educate the community, and instill public confidence in their recommendations for CRB specifications. This brief describes the impetus behind the demand for a CRB, the importance of engaging people of color in the design of a CRB, and the CRB specifications proposed by ASJ. We close with recommendations to The City for moving forward.

## What is a Citizens Review Board

ASJ calls for a CRB in Cedar Rapids in order to ensure that people of color -- who currently are grossly overrepresented in stops, arrests, and incarceration -- have an independent body to go to with complaints, whom they can trust will provide a fair and insightful review of the actions and the complaints.

A CRB is a formal entity comprising community members, which serves as an independent authority to monitor local policing. This includes investigating alleged officer misconduct, reviewing where excessive and lethal force has been used by an officer and instances when an officer's firearm was discharged, and systemic disparities, such as racial profiling in traffic stops.

The National Institute of Justice, an arm of the U.S. Department of Justice, identifies four basic types of CRBs:

> Type 1: Citizens investigate allegations of police mis-conduct and recommend findings to the chief or sheriff.
>
> Type 2: Police officers investigate allegations and develop findings; citizens review and recommend that the chief or sheriff approve or reject the findings.
>
> Type 3: Complainants may appeal findings established by the police or sheriff's department to citizens, who review them and then recommend their own findings to the chief or sheriff.

> Type 4: An auditor investigates the process by which the police or sheriff's department accepts and investigates complaints and reports on the thoroughness and fairness of the process to the department and the public. (Finn, 2001)

Nationally, there are more than 150 CRBs in existence and no two are alike -- they have varied authorities, compositions, and procedures (McEllhiney & Perez, 2020). The design specifications for the Cedar Rapids CRB are highly consequential and have not yet been determined. The processes used to design the CRB can both set the tone for the Board's work and set the stage for the Board's impact over time.

## The significance of the Cedar Rapids CRB design processes

Cedar Rapids is poised to make history -- The City has the opportunity to address complicated issues related to race and historical trauma in a way that fosters collaboration, reconciliation, and justice or to engage the very processes that reinforce the system as we know it. ASJ is inviting The City to lean into the difficult work of understanding itself in new ways so that the solutions we land on together meet the promise of this historic moment.

This is especially important because **the process in Cedar Rapids of deliberating the function and design of a CRB is setting the stage for potential collaboration and problem solving across the board**. While the design specifications for the CRB are consequential, even more important are the signals sent by City and community leaders about their willingness to name and address the difficult root causes of racial disproportionately and the wide range of feelings of vulnerability, loss, and anger across the community.

## Race must be at the center of deliberations about design

The call for a CRB is part of a broader agenda to achieve racial justice in Cedar Rapids. The success of a CRB is highly dependent upon the extent to which The City is able to center race in deliberations about its design. This involves grappling with both the history of race in the United States and the particularities of race in Cedar Rapids.

At the heart of the challenge are well documented ways that police forces have been used since the 1619 to maintain systems of racial oppression in what has become the

United States. Communities of color in Iowa, as across the nation, have been historically and disproportionately surveilled, arrested, and incarcerated.  In 2017, African Americans comprised 4% of Iowa's population yet 25% of those who were incarcerated (Schlesselman & Rossi, June 3, 2020). In Linn County, Black people make up only 4.8% of the population but are 25 times more likely to be cited rather than warned during traffic stops (Duffelmeyer, Bettis, Lovell & Walker, 2017). In studies conducted in Iowa City and Davenport, African American drivers in 2015 were far more likely to be stopped, requested to submit to a search, given a citation, and arrested than white drivers, though they were not more likely to be engaged in unlawful behaviors (Barnum, 2015). The ACLU has found that Black people are 10 times more likely to be arrested for marijuana use as compared to their white peers, though both demographics have been shown to have similar rates of usage (ACLU, 2020).

With this backdrop, mistrust of the police within communities of color is understandable. But it is insidious. Given the dynamics between law enforcement and residents, mutual mistrust can lead to deadly outcomes, can leave communities of color persistently underserved, and maintains the historical narrative that communities of color are unlawful, dangerous, and a source of problems for the broader community.

The lack of trust between and among community members and those sworn to protect and serve them is palpable and the highly publicized deaths of George Floyd and Breonna Taylor triggered many in the Cedar Rapids community, as it has triggered communities around the globe. Yet, the call to create a CRB did not originate as a result of the death of George Floyd in May 2020. The most recent iteration of the call for a CRB came nearly four years ago in response to the shooting of a local Black man, Jerime Mitchell, by police officer Lucas Jones in November of 2016 and the subsequent handling of the case. In early 2017, an ad hoc community group approached The City with the fears and concerns of the community, including particular concerns of Black communities in Linn County. While some could argue that significant strides have been made toward addressing the issues related to race that undergirded that particular incident, little real progress on the original steps outlined by the community is evident. The mediated negotiations fell apart; the call for a CRB languished. The officer remained on the police force for three and a half years before being let go for reasons unrelated to the original incident. There is little evidence that progress has been made by way of changes to policy or outcomes. This historical context in Cedar Rapids is critical to understanding why community engagement is necessary in the design of the CRB.

At the same time, the community is involved in efforts to enact an emerging vision for safe, equitable, and thriving neighborhoods. This vision began taking shape as a response to the death of local a Black youth due to gun violence in 2015. "In September of that year, a 15-year-old was shot and killed in a city park by his 14-year-old peer" (Walker & Wilcynski, February 2017, p. 5). In 2016, The City authorized a Task Force to study the issue of gun violence in Cedar Rapids and public and private entities stepped forward to champion the cause (City of Cedar Rapids, n.d.).

This confluence of racialized movements creates a challenging situation for Cedar Rapids. One of the significant challenges facing The City and ASJ is the prevailing story about gun violence in Cedar Rapids, which is that Black people and people of color more generally are bringing crime into the community and that (all) people of color are making "our" community less safe. This is a historical and persistent narrative about the inherent criminality of communities of color that is triggered every time a Black person is in the news for shooting or being shot. It is further a story about who is legitimately a Cedar Rapidian and who gets to make decisions on behalf of the community.

The insidiousness of this narrative is that it implicates entire communities of color as responsible for the culture and conditions that breed violence, rather than implicating the historical roots and enduring systemic and systematic oppression experienced by people of color. This is not a problem unique to Linn County. A report by the Giffords Law Center to Prevent Gun Violence explains the following:

> Most homicides are perpetrated by a very small percentage of the population, often known to law enforcement. Street groups involved in violence constitute on average less than 0.6% of a city's population, with an even smaller percentage of that group actually perpetrating violent crimes.
>
> And yet in communities across the country, including some of those hardest hit by gun violence, researchers documented a concerning combination of distrust in law enforcement, underreporting of crimes, declines in witness cooperation and engagement with officers, less informed policing, unsolved murders and spikes in violence.
>
> Instead of acknowledging this complicated phenomenon, many departments uphold myths of cities described as "murder capitals," where residents are accused of being complacent about gun violence and unwilling to help police hold shooters accountable (The Guardian, January 2020).

Arlie Frielich, author of the Giffords report, notes that, "So much of what isn't working about traditional policing is built on myths and leads to policies that treat whole communities as part of the problem rather than victims, witnesses and the solution to violence" (The Guardian, January 2020). Communities that have been able to collaborate to overcome mistrust enjoy significant improvements in outcomes across the board. In Oakland, California, for example, gun homicides dropped 44% between 2007 and 2018. "The drop coincided with a rise in clearance rates for homicides, and with the growth of collaborations between local faith leaders and grassroots organizers who have pushed the police departments to adopt progressive policing practices. Homicide solve rates rose from 29% in 2011 to over 70% six years later, suggesting that community trust and partnership were improving, too" (The Guardian, June 3, 2019).

This moment in history, when so many are recognizing the ways that race has impacted our communities, offers Cedar Rapidians a chance to overcome many of the thorny issues related to race that comprise the root cause of the strife and tension underlying the establishment of a CRB. In order to move forward, both sides should strive to learn together the many ways that race is implicated in the definition of the problem to be fixed right here in Cedar Rapids and in the range of solutions that are being offered.

## It is very difficult to keep race at the center of deliberations

Though critical, it is very difficult to center race in the deliberation about how to make Cedar Rapids a community in which people of color thrive. While it seems like common sense that race would be a central consideration in designing responses to ASJ demands at this historic time when race is at the front of the nation's consciousness, "[c]entering race … is actually a complex process that requires filtering each decision, large and small, through a series of steps designed to question the assumptions that are at play in planning processes and implementation activities" (Stumbo, Antón & Grove, 2020).

History teaches us that systems designed without the voices of people of color ultimately will not address race and that systems have incredible resilience, regularly putting institutions in place that serve to protect the system as it stands. The design of a CRB in Cedar Rapids is no exception. For example, The City's goals for establishing a CRB are "to ensure public safety accountability, bolster confidence in police, increase and improve public cooperation, and make our community safer for everyone." While these goals appear lofty and appropriate, unpacking them through the lens of race helps

to surface the ways that the goals -- perhaps unintentionally-- suggest people of color are the problem, instead of historical, systemic racial bias. Examples follow.

> **To "ensure public safety accountability":** Accountability of what? To whom? This statement skirts the issue of accountability of the police to the general public, which is what is being called for by ASJ. Whether it is accurate or not, skirting the issue makes it appear that The City wishes to avoid holding the police accountable.
>
> **To "bolster confidence in police":** Instead of centering the concerns of the community, this statement centers the police. It signals that The City is more interested in protecting an institution than protecting and serving communities of color.
>
> **To "increase and improve public cooperation":** This statement places the burden of change on communities of color without acknowledging the historical realities of race and racism, feeding the false narrative that communities of color actively work to thwart efforts by the police to arrive at justice.
>
> **To "make our community safer for everyone":** The controversy over "black lives matter" versus "all lives matter" is baked into this statement. Absent any signal that minorities are to be protected from the tyranny of the majority and taken in the context of a proposed public engagement process that relegates people of color to their permanent minority status, there is nothing in this statement that counters the prevailing notion that the community at large is in danger, not that Black people are in danger.

It turns out that these four purposes for a CRB do not acknowledge the history of racial disproportionality in policing. Yet, for the CRB to do what it sets out to do, designers must be willing to name and examine the difficult confluence of issues that make the current demands for racial justice by ASJ (and by Black Lives Matter affiliates across the country) so heart wrenching.  While it may be relatively easy for many to condemn the blatant misuse of force by officers who executed a no-knock search warrant and shot Breonna Taylor eight times, it is much more difficult to adjudicate the over-policing of Black communities and the nuanced responses from people of color (Costello & Duvall, 2020). Perpetrators of gun violence comprise a tiny fraction of any community, yet entire neighborhoods are deemed "dangerous" when gun violence occurs.

To center race requires having meaningful conversations about the often conflicting ways that race is manifested in a local community or institution. It further requires the use of protocols to review deliberations in the moment and after the fact to ensure that difficult subjects are not avoided. To work through these issues, it is critical that people of color be at the table when these conversations are underway, and that the work is facilitated by someone adept at centering race and facilitating difficult conversations. Safeguards and protocols should be put in place to ensure the process keeps race at the center. This can include bringing in a mediator who understands the nuances of race and racism in the US as well as the instincts and actions that serve to take race off the table. This includes working together to understand the multiple ways that race and racial bias help to construct the challenges faced in Cedar Rapids, which requires a difficult balance between patience and urgency.

No matter what the formal structure ultimately looks like, attending to issues of race and justice in the design process is vital if the CRB is to be set up to address race and racial injustice in the exercise of its charge, which is the reasoning behind the call for a Cedar Rapids CRB in the first place.

## Recommended CRB Specifications

In addition to centering race in the design process and addressing the unique history in Cedar Rapids, it also is important to glean lessons from CRBs that have been established in other cities. In developing recommended specifications for a Cedar Rapids CRB, ASJ reviewed research and interviewed the National Association for Civilian Oversight of Law Enforcement (NACOLE), a non-profit organization that "works to enhance accountability and transparency in policing and build community trust through civilian oversight" (NACOLE, n.d.), and the NAACP, which has developed ten principles for an effective civilian board (Brooks, C.W., Brock, R.M. & Bolling-Williams, B., 2014).

In this section, we describe the rationale behind each of the original specifications (A-G) and offer additional specifications for consideration (H-K).

A. **The Board shall retain the authority to issue formal reprimands with legal standing for officer misconduct.**

Boards without authority to determine appropriate disciplinary action are relegated to presenting non-binding recommendations, not only diluting the quality of the

investigation but also accountability for implementing reprimands. This has been a common criticism of Iowa City's CRB and has resulted in a general lack of confidence in the effectiveness of their Board (Townsend, O., personal communication, February 2018). NACOLE has listed this stipulation as an essential component for a CRB to be responsive to community needs (NACOLE, June 1, 2020). For example, this power has been granted to the CRB in Newark, NJ; the power to issue formal reprimands has not interfered with due process rights of officers and has aided in the identification of officers who are disproportionately targeting Black individuals (Rummell, June 19, 2019).

CRB findings/rulings shall be binding -- unless disputed by the Chief of Police -- and they should be acted upon within fourteen days. If the Chief of Police disputes the ruling, the dispute would go to the City Council to be settled by a public vote. Rulings of the CRB are binding, meaning if the CRB recommends that an officer is terminated, it should be binding, and only reversible by a council vote. Providing this authority to the CRB would require amending the current CRPD discipline matrix.

    **B. This Board shall retain the authority to issue reports and recommendations to local law enforcement agencies and their governing bodies, and develop a rating system that would independently assess and recommend changes in police policies and practices, and review other relevant metrics.**

This enables the Board to identify strengths and shortfalls, monitor trends related to police conduct, and assess progress over a period of time. The ability to review police records is critical to the success of a CRB (Walker, 2003; Police Assessment Resource Center, 2005; Attard and Olson, 2013; King, 2015) and is essential to providing "fact-driven" recommendations (NACOLE, June 1, 2020). The reports provide transparency for all parties and continuity regardless of changes in leadership. When this transparency is not granted, it limits the ability of the CRB to adequately respond to the direct needs of the community. Additionally, the need for CRBs to provide recommendations for changes in policy has been cited as one of the most important functions of a CRB (Walker & Archbold, 2014). This allows the CRB to begin to address systemic issues in policing while also providing the added benefit of improving relations with law enforcement and the community (NACOLE, June 1, 2020). To ensure that these recommendations are thoroughly reviewed by the police department, written responses are required and also made public.

    **C. The Citizens Review Board shall be empowered to initiate other investigations and reviews at its sole discretion and have unfettered**

> **access to relevant documents. The investigations completed by the CRB will be made public.**

It is important that the scope of the CRB go beyond simply reviewing citizen complaints. While a CRB can offer residents confidence that their complaints of misconduct or harassment will be taken seriously and investigated, to rely solely on complaints as the basis for what the CRB may consider would be to put the burden of correcting systemic disparities on individual residents. To lodge a complaint against law enforcement requires tremendous emotional labor and significant risk to one's reputation, livelihood, friendships, and even life. Rather than relying solely on individuals to identify systemic problems, the CRB should be proactive in asking for data and checking rules and procedures. As new evidence is encountered and new disparities come to light locally or nationally, the CRB must not be reliant on the completion of department investigations and will have full direct access to witnesses and police documents, including mandatory cooperation of police and subpoena power. Thirty-one of 55 CRBs responding to the NACOLE survey indicated they have subpoena power; this will reduce delays in investigations and ensure accurate, evidence-based investigations (NACOLE, 2020).

> **D. This Board shall receive and review public quarterly reports of police stops and arrests with breakdowns of the attending demographic information including stops and arrests by race and ethnicity. These reports shall be given by the Chief of Police.**

Providing quarterly reports instills greater confidence in the police department and aids in the public's perception of their credibility (Jerome, 2006). These are the sorts of data that will help the CRB to meet its obligation to identify systemic issues that may not surface through individual complaints. The police department is already collecting some of these data, so providing them to the CRB would not require additional work by the department. In addition to the data being collected, relevant demographic information will now be formally recorded (i.e. race, ethnicity, gender etc.) which has previously not been formally recorded. The report should be written in an easily accessible format and indicate trends in arrest rates, traffic stops, and complaints including race demographic data (NACOLE, June 1, 2020). Sharing this information would allow early identification of misconduct or bias and allow the board to assist in policy recommendations, a common practice of CRBs nationally.

> **E. This Board retains the authority to delegate investigatory and review functions to other organizations as needed.**

Should the caseload exceed the capacity of the CRB, this provision allows for advice from external organizations (e.g., Civil Rights Commission).

F. **The results of completed internal investigations for officer misconduct or use of force cases performed by the Cedar Rapids Police Department shall be turned over to the Board in a timely manner throughout the course of the Board's investigations and inquiries.**

The effectiveness of the CRB starts with the responsiveness of the police department. Former director of New York City's CRB, Richard Emery, has identified that the speed at which relevant information regarding investigations is received by a city's CRB as a key factor in determining the effectiveness of a Board (Denny, 2019).

G. **Include "when an officer draws their firearm on a subject or uses their firearm during precautionary positioning maneuvers," as a definition of Use of Force which would make this action subject to review and/or investigation by the Board.**

Statistically, people from minority ethnic groups are shot at higher rates (Peoples, 2019) and Black men specifically are 2.5 times more likely to be killed by police than white men (Edwards, Lee, & Esposito, 2019). Other studies have shown that officers are more likely to draw their firearms on minority suspects (Wheeler, Phillips, Worrall & Bishopp, 2017).

H. **The membership of the Board shall be diverse and gender-balanced.**

Creation of the Board is rooted in concerns of subjecting communities of color to disproportionate police oversight and use of excessive force. Therefore, the makeup of the Board should take into consideration race/ethnicity demographics of the city (overall and by age band) and crime statistics (including alleged and convicted perpetrators). Iowa Code offers precedence for this specification, as it calls for boards and commissions to be gender balanced (Iowa Code, 2020).

I. **Membership of the Board shall be specified in by-laws.**

Bylaws should be crafted and include details about the membership of the CRB, including:
1. The CRB should be comprised of eleven members
2. At least 50% of the CRB should be people of color

3. CRB membership should include at least one attorney
4. CRB members must be residents of Cedar Rapids
5. CRB members will serve staggered three-year terms with a two-term maximum
6. Initial board members will serve at least two years
7. The Board shall elect new members
    a. Nine of the eleven CRB members will be nominated by current Board members
    b. Two of the eleven CRB members will be nominated by the mayor
    c. City Council will confirm all nominated members (recommended by NACOLE)

**J. The Board shall have resources to support their investigations.**

Resources include paid staff, independent legal counsel, training, and communications support. Regarding paid staff, all but two of 55 NACOLE survey respondents have paid staff to support the board. Sixteen of 55 survey respondents have independent legal counsel. Effective CRBs provide training on police department policies and procedures to new members; 44 of 55 CRBs responding to the NACOLE survey indicated they provide such training (NACOLE, 2020). CRBs further must regularly disseminate information and findings to the public. Funding will be required for each of these resources.

**K. The CRB shall have the authority to hire/fire the chief of police**

The CRB's authority should include hiring and firing the chief of police, similar to that of the Oakland Community Police Review Agency (City of Oakland, 2020).

# Involving ASJ in the Design of the CRB

As The City enters the next phase of design work on the CRB, people of color must be at the design table to help ensure the practical concerns of those previously marginalized in Cedar Rapids are addressed. ASJ represents the voices of people of color, who have been systematically marginalized in Cedar Rapids and who have been disproportionately impacted by detrimental law enforcement actions across the board. ASJ also has conducted significant research on the purposes, functions, authorities, and designs of CRBs nationally, as encapsulated in this paper. The City has outlined a public engagement process to garner input on the CRB and ASJ is prepared to play a significant role in this process. Working together in this next phase will demonstrate a

collective willingness to lean into the difficult questions about race and policing. Moving forward, representatives of ASJ should be formally seated with The City as the CRB is designed.

The work in front of The City is not simply to choose how a CRB will function. The process selected to establish the CRB sets up the likelihood that the CRB will carry through on its functions. Nuanced decisions will need to be made about the system's infrastructure. The process used to make those decisions will set the stage for the ongoing process of racial reconciliation in Cedar Rapids … or not.  It is incumbent upon The City to ensure the voices of people of color are consequential in the CRB design process; ASJ is the appropriate body to engage to meet this opportunity.

# References

All Things Considered, Former Chief Of Reformed Camden, N.J., Force: Police Need 'Consent Of The People', June 8, 2020
https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/06/08/872416644/former-chief-of-reformed-camden-n-j-force-police-need-consent-of-the-people

Attard, B. & Olson, K., (2013). Overview of Civilian Oversight of Law Enforcement in the United States. National Association for Civilian Oversight: Tucson, AZ. Retrieved July 26, 2020, from
http://accountabilityassociates.org/wp-content/uploads/Oversight-in-the-US-%E2%80%A6FINAL.pdf

Barnum, C. (2016). Summary of Results ICPD Traffic Study 2015. Retrieved July 19, 2020, from www.iowa-city.org/weblink/0/doc/1524345/Electronic.aspx.

Beckett, L., BondGraham, D., Andringa, P. & Clayton, A. (June 3, 2019). Gun violence has sharply declined in California's Bay Area. What happened? *The Guardian*, retrieved July 22, 2020, from
https://www.theguardian.com/us-news/ng-interactive/2019/jun/03/gun-violence-bay-area-drop-30-percent-why-investigation

Brooks, C.W., Brock, R.M. & Bolling-Williams, B. (2014). Born Suspect: Stop-and-Frisk Abuses & the Continued Fight to End Racial Profiling in America. NAACP: Baltimore, MD. Retrieved July 26, 2020, from
https://www.prisonpolicy.org/scans/naacp/Born_Suspect_Report_final_web.pdf.

Buchner, B., Perez, L., McEllhiney, C. & Diaz, E.I. (2016). Guidebook for the Implementation of New or Revitalized Police Oversight. National Association for Civilian Oversight: Tucson, AZ. Retrieved July 26, 2020, from https://d3n8a8pro7vhmx.cloudfront.net/nacole/pages/175/attachments/original/1534263107/Guidebook_for_the_Implementation_of_New_or_Revitalized_Police_Oversight_2016_FINAL.pdf?1534263107.

Carney, J. (June 11, 2020). Rand Paul introduces bill to end no-knock warrants. The Hill: Washington, DC. Retrieved July 26, 2020, from https://thehill.com/homenews/senate/502392-rand-paul-introduces-bill-to-end-no-knock-warrants.

Cedar Rapids City Council. (June 19, 2020). Minutes of the City Council Special Session (Electronic). Retrieved July 26, 2020, from https://cms.revize.com/revize/cedarrapids/CityCouncil/2020/2020-06-19_Minutes_Special.pdf

City of Cedar Rapids. (n.d.). Retrieved July 26, 2020. https://www.cedar-rapids.org/local_government/city_boards_and_commissions/s_e_t_task_force.php

City of Oakland. (2020). Community Police Review Agency. Webpage retrieved July 26, 2020, from https://www.oaklandca.gov/departments/community-police-review-agency.

Costello, D. & Duvall, T. (May 12, 2020). Who was Breonna Taylor? What we know about the Louisville ER tech fatally shot by police. Louisville Courier Journal: Louisville, KY. Retrieved July 26, 2020, from https://www.courier-journal.com/story/news/local/2020/05/12/breonna-taylor-case-what-know-louisville-emt-killed-cops/3110066001/.

Denney, A. (April 15, 2019). Civilian Oversight Is a Solution to Police Misconduct. But is it Effective? New York, NY: Freethink Media, Inc. Retrieved July 26, 2020, from https://www.freethink.com/articles/civilian-oversight-of-police-seems-like-a-commonsense-solution-to-police-misconduct-but-is-it-effective

Duffelmeyer, A.B., Bettis, R., Lovell II, R.E. & Walker, D.S. (November 30, 2017). Retrieved July 26, 2020, from

https://www.aclu-ia.org/sites/default/files/stamped_233677_261194_2017-11-30_final_brown_amicus.pdf.

Edwards, E., Greytak, E., Madubuonwu, B., Sanchez, T., Beiers, S. Resing, C., Fernandez, P. & Galai, S. (2020). A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform. New York, NY: American Civil Liberties Union. Retrieved July 26, 2020, from https://www.aclu-ia.org/sites/default/files/tale_of_two_countries_racially_targeted_arrests_in_the_era_of_marijuana_reform.pdf

King, Kevin. 2015. "Effectively Implementing Civilian Oversight Boards to Ensure Police Accountability and Strengthen Police-Community Relations." Hastings Race and Poverty Law Journal 12 (91–259). https://litigation-essentials.lexisnexis.com

Schlesselman, H. & Rossi, M. (June 3, 2020) VERIFY: Rate of incarceration highest among black Iowans, retrieved July 23, 2020, from https://www.weareiowa.com/article/news/verify/verify-iowa-incarceration-rates-by-race-african-american-black-hispanic-jail/524-62eb1e74-68f7-4dc6-ac49-aa6b7071163f

The Guardian. (Updated January 2020). Distrust of police is major driver of US gun violence, report warns. *The Guardian*. https://www.theguardian.com/us-news/2020/jan/21/police-gun-violence-trust-report#new_tab

Iowa Code 2020, Section 69.16A (13, 0).

Finn, P. (2001). Citizen Review of Police: Approaches and Implementation, National Institute of Justice: Washington, DC. Retrieved July 26, 2020, from https://www.ncjrs.gov/pdffiles1/nij/184430.pdf.

Giffords Law Center to Prevent Gun Violence. (2020). In Pursuit of Peace: Building Police-Community Trust to Break the Cycle of Violence. Giffords Law Center to Prevent Gun Violence: San Francisco, CA. Retrieved July 26, 2020, from https://lawcenter.giffords.org/wp-content/uploads/2020/01/Giffords-Law-Center-In-Pursuit-of-Peace.pdf.

Goldsmith, Andrew J., and Colleen Lewis. 2000. *Civilian Oversight of Policing: Governance, Democracy, and Human Rights*. Portland, Ore.: Hart Pub.

Jerome, R. (2006). Credibility, Impartiality, and Independence in Citizen Oversight. In Citizen Oversight of Law Enforcement, 1st ed., edited by Justina Cintron Perino. Chicago, IL: American Bar Association.

McEllhiney, C. & Perez, L. (June 29, 2020). Civilian Oversight of Law Enforcement. Webinar. National Association of Civilian Oversight of Law Enforcement: Tucson, AZ.

Mugari, Ishmael. (May 17, 2018). Rethinking the Models of Police Oversight: Toward a New Paradigm. 10.1007/978-3-319-31816-5_3631-1

National Association of Civilian Oversight of Law Enforcement. (n.d.). Website retrieved July 26, 2020, from https://www.nacole.org/.

National Association of Civilian Oversight of Law Enforcement. (June 1, 2020). Thirteen Principles for Effective Oversight. National Association of Civilian Oversight of Law Enforcement: Tucson, AZ.

National Association of Civilian Oversight of Law Enforcement. (2020). Civilian Oversight Agency Directory Database. National Association of Civilian Oversight of Law Enforcement: Tucson, AZ.

Police Assessment Resource Center. (2005). Review of National Police Oversight Models for The Eugene Police Commission. Police Assessment Resource Center: Los Angeles, California. Retrieved July 26, 2020, from http://www.parc.info/eugene.

Peoples, L. (September 4, 2019). What the data say about police shootings. *Nature*, Retrieved July 26, 2020, fro https://www.nature.com/articles/d41586-019-02601-9

Rummel, N. (June 19, 2019). "Powers of Newark's Civilian Police Review Board Restored on Appeal" Courthouse News, retrieved July 26, 2020, from https://www.courthousenews.com/powers-of-newarks-civilian-police-review-board-restored-on-appeal/

Seyffert, P. (September 13, 2017). "Can Professional Civilian Oversight Improve Community-Police Relations?" The Police Chief Online, retrieved July 26, 2020, from https://www.policechiefmagazine.org/can-professional-civilian-oversight-improve-community-police-relations/

Stumbo, C., Antón, M. & Grove, D. (June 2020). Centering Race in Iowa's Return-To-Learn Plans. West Wind Education Policy Inc.: Iowa City, IA.

U.S. Department of Justice, Civil Rights Division: Investigation of the Baltimore City of Police Department (2016) https://www.justice.gov/opa/file/883366/download

Walker, S. (2003). Core Principles for an Effective Police Auditor's Office. Retrieved July 26, 2020, from https://samuelwalker.net/wp-content/uploads/2010/06/coreprinciples.pdf

Walker, S. & Archbold, C. (2014). The New World of Police Accountability. 2nd Ed. SAGE Publications, Inc: Thousand Oaks, CA.